1

2

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

3

4

**DANIEL RODRIGUEZ-LOPEZ, et al.**

5

**Plaintiffs,**

6

**v.**

**Civil Action No. 08-1212 (GAG)**

7

**ROMAN VELASCO-GONZALEZ, et al.**

8

**Defendants.**

9

10

**OPINION AND ORDER**

11

12

Various plaintiffs commenced this action seeking money damages and future enjoinment of

13

the defendants' actions, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e

14

et seq. and the Civil Rights Act of 1991, 42 U.S.C. §1981a; the Fourth, Sixth, and Fourteenth

15

Amendments to the U.S. Constitution; and 42 U.S.C. § 1983.  Plaintiffs also invoke the pendent

16

jurisdiction of the court to adjudicate claims under Puerto Rico state laws: Laws Number 100 and

17

17, P.R. Laws Ann. tit. 29, §§ 146 et seq., §§ 155 et seq.,  respectively; and Article 1802 and 1803

18

of the Civil Code of Puerto Rico; P.R. Laws Ann. tit. 31, §§ 5141-42.  Jurisdiction in this court is

19

invoked pursuant to 28 U.S.C. §§ 1343, 1343(4) and 42 U.S.C. § 1000e-5(f), and right to sue letters

20

issued by the Equal Employment Opportunity Commission ("EEOC") on November 20, 2008.

21

This matter is currently before the court on the defendants' motions for summary judgment.

22

(Docket Nos. 96, 98.)  Plaintiffs timely opposed defendants' motions for summary judgment.

23

(Docket Nos. 112, 113.)  After reviewing the pleadings and pertinent law, the court **GRANTS** in

24

part and **DENIES** in part defendants' motions for summary judgment.

25

**I._____Standard of Review**

26

Summary judgment is appropriate when "the pleadings, depositions, answers to

27

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

28

genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter

**Civil No. 08-1212(GAG)**                    2

of law." Fed.R.Civ.P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'"  <u>Iverson v. City of Boston</u>, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (citations omitted).  The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case.  <u>Celotex</u>, 477 U.S. at 325.  "The movant must aver an absence of evidence to support the nonmoving party's case. The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material."  <u>Maldonado-Denis v. Castillo-Rodriguez</u>, 23 F.3d 576, 581 (1st Cir. 1994).  The nonmoving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).  If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment.  <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party (here, the plaintiff) and give that party the benefit of any and all reasonable inferences.  <u>Id.</u> at 255.  Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence.  <u>Id.</u>  Summary judgment may be appropriate, however, if the non-moving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation."  <u>Forestier Fradera v. Municipality of Mayaguez</u>, 440 F.3d 17, 21 (1st Cir. 2006) (quoting <u>Benoit v. Technical Mfg. Corp.</u>, 331 F.3d 166, 173 (1st Cir. 2003)).

**II.    Relevant Factual & Procedural Background**

On October 18, 2004, co-plaintiff in this action, Daniel Rodriguez-Lopez ("Lopez") started working at the Labor Department of the Commonwealth of Puerto Rico ("LDPR"), as both, a chauffeur and assistant to co-defendant, Roman Velasco Gonzalez ("Velasco"), Secretary of the LDPR.  In December of 2005, Lopez alleges that Velasco began sexually harassing him on a daily basis.  The alleged sexual harassment consisted of an invitation by Velasco to Lopez to have sexual

**Civil No. 08-1212(GAG)**                    3

relations with him, vulgar sexual language, and other various forms of verbal sexual statements.

On August 30, 2006, Lopez presented a resignation letter, in which he stated that he was tendering his irrevocable resignation from the confidential post to which he was assigned.  As reason for his resignation, Lopez wrote that Velasco had stated on multiple occasions that he no longer trusted Lopez to perform the duties required of his position of confidence. (See Docket No. 95-11.) On this same date, Lopez explained his decision to his father, citing Velasco's constant harassment as the reason for his resignation.  Lopez said this constant harassment came in the form of both sexual and labor harassment.  He described the labor harassment as constant questions from Velasco inquiring into everything about Lopez's life.  Lopez described the sexual harassment as broad, citing numerous instances in which he felt sexually harassed by Velasco.

Specifically, with regard to the claims of sexual harassment, Lopez described a number of specific instances.  On one occasion, Velasco compared Lopez's buttocks to those of a character in the movie "Brokeback Mountain." (See Docket No. 95-2 at 17.)   On an everyday basis, for approximately 2 to 3 weeks, beginning around the time when the movie "Brokeback Mountain" was being reported in the newspaper, Velasco would place clippings from the newspaper about the movie on the bulletin board at work and write Lopez's name under the pictures.  In the clippings, Lopez was depicted as a homosexual character from the movie.  Each morning when Velasco arrived and sat down to have breakfast he would ask "who gave it to who last night from behind" (referring to Lopez and Joel, another LDPR employee) (See Docket No. 112-4  at 23-25.)  In addition, Velasco made a comment to Lopez one day about how males today shave their bodies and used the word "trimming" when asking Lopez if he shaves.  Lopez inferred from the use of that word that Velasco was talking about his genitals.  (See Docket Nos. 95-2 at 47-50, 95-3 at1-4.)  Also, at a birthday party celebration for Velasco, Lopez's name was placed on a donkey.  Velasco stated that the donkey was named after Lopez because it had big buttocks. (See Docket No. 112-3 at 8-9.)  On the evening of Velasco's birthday celebration, when Lopez drove Velasco to his home, Velasco told Lopez that he wanted to have a "big night." Based upon the tone of Velasco's voice,  Lopez interpreted this

**Civil No. 08-1212(GAG)**                4

comment to mean that he wanted to have sexual relations with him. (See Docket No. 112-3 at 13-15.) In February 2006, Velasco instructed Lopez to drive Marisol Viera (LDPR employee) anywhere she told him, for the purpose of preparing for a party for Olga Vilches at the office.  During this trip, Viera asked Lopez to drive her to Condom World, where she purchased pornographic playing cards. (See Docket No. 95-6 at 36-39, 46-47.)  These pornographic playing cards were displayed during a birthday celebration for Olga Vilches at Velasco's office (See Docket No. 112-4 at 16.)  On occasion, Velasco would comment on how Lopez filled the rear of his pants more than Joel (another LDPR employee) (See Docket No. 95-4 at 6.)

When he resigned, Lopez did not include any of these incidents as reasons for his resignation. He cited his fear of reprisal as well as his own embarrassment as reasons for their exclusion.  One or two days after his resignation, Lopez called Velasco to inform him that he had resigned and to apologize for the way things had turned out.  He also wanted to see if it was possible for Velasco to help him get a new job because he now had a family and he needed medical insurance.  Velasco agreed to help Lopez get a job and changed the effective date of his resignation to October 15, 2006 so he could remain employed until Velasco was able to relocate him.  On October 15, 2006, Lopez was relocated to work in the Office of the Inspector of Cooperatives ("IOC").

On February 9, 2007 Lopez filed a claim with the Labor Department's anti-discrimination unit and the EEOC, claiming that he had been sexually harassed by Velasco while working at the LDPR.  On February 14, 2007, Lopez provided a sworn statement stating all incidents related to the sexual harassment claims.  On this date he appeared on the radio network "NotiUno" where he described the allegations against Velasco.  Velasco responded publicly to the allegations made against him by Lopez through the "El Vocero" newspaper.

Throughout the course of the abovementioned events, Lopez was in possession of three firearms, for which he had weapons permits issued by the Puerto Rico Police Department ("PRPD"). Individuals with weapons licenses must comply with the requirements of the Weapons Law 404 and its Regulation 7311.  Pursuant to Article 2.13 of Weapons Law 404, P.R. Laws Ann. tit. 25, § 456a,

**Civil No. 08-1212(GAG)**                    5

if the owner of the firearms moves at any point, a change of address has to be notified to the police within thirty days of the change.[1]  As of May 7, 2005, in complying with this regulation, Lopez had listed his parent's home in Guaynabo as his address.  Between June and July 2005, Lopez moved to his current address in Trujillo Alto, but failed to alert the PRPD to this change of address.  At some point after April 2006, Lopez temporarily moved to his grandparents home in Caparra Terrace, San Juan.  On September 10, 2006, Lopez notified the PRPD to his change of address and listed as his new address his grandparents home in Caparra Terrace.  However, upon returning to his apartment in Trujillo Alto, Lopez again failed to notify the PRPD that he no longer lived in Caparra Terrace.  Thus, Lopez had failed to comply with the change of address notification requirement of Law 404.

On February 15, 2007, one day after Lopez went public with his allegations against Velasco, Sergeant Julio Andino Rohena ("Andino") and Agents Luis Gonzalez Gallardo ("Gallardo") and Edier Triado Rivera ("Triado"), wearing civilian clothes, arrived at Lopez's grandparent's home in Caparra Terrace, San Juan to seize Lopez's weapons.  There is disagreement among the parties as to whether there were other uniformed officers present.  Co-plaintiff Zoraida Rodriguez-Diaz ("Zoraida"), aunt of Lopez, who lives next to her parents and was present during the seizure, testified that there were 4 to 5 officers in total.  She further testified that the presence of the officers was agitating her elderly father, Fernando Rodriguez Diaz ("Fernando").  Co-plaintiff Fernando, grandfather of Lopez, told the agents that Lopez did not live there.  Also present during the intervention was Lopez's attorney Olga Birriel ("Birriel").  Birriel described the agents behavior as "hostile and aggressive."  Co-plaintiff Daniel Rodriguez Diaz ("Daniel"), Lopez's father, arrived minutes later and informed the agents that he had two firearms from his son which were at his

---

[1] The cited provision reads, "Every licensee shall inform the Superintendent of his/her change of residential or mailing address within thirty (30) days of the change, under penalty of an administrative fine of two hundred dollars ($200), which shall be paid as a requirement for renewing the license." P.R. Laws Ann. tit. 25, § 456a.

**Civil No. 08-1212(GAG)**                    6

(Daniel's) home.  Daniel told the agents to accompany him to his home in Guaynabo so he could give them the weapons.  He then accompanied the agents to Lopez's house in Trujillo Alto to seize the remaining weapon.  A receipt was given for all the property seized.

According to the PRPD, they were informed of Lopez's failure to notify on February 15, 2007 when Tomas de Jesus Mangual "(Mangual)," reporter for "El Vocero," called Jose Marrero Ruiz ("Marrero"), Auxillary Superintendent of Citizens Services at the PRPD, and informed him that Lopez had not notified a change of address with the Arms Registry.  According to the testimony of Marrero, no one within the PRPD inquired into how Mangual had acquired this information. With this information, Marrero contacted Luis Rodriguez Vasquez ("Vasquez"), Auxillary Director of the Weapons Registry Division, and gave him instructions to investigate and seize the weapons of Lopez for his failure to notify a change of address.  Vasquez claims that his orders to investigate and seize Lopez's weapons came from Marrero's determination that Lopez's allegations against Velasco presented a security risk to a public official (Velasco).[2]  Vasquez then orally gave this information to Eduardo Ferrer ("Ferrer"), analyst for the Weapons Registry Division, and told Ferrer to proceed with a seizure of the weapons for security purposes, pursuant to Act 404, P.R. Laws Ann. tit. 25, § 456l.[3]  Following Ferrer's investigation, an order to seize the weapons was issued and signed by the

---

[2] The written document ordering the seizure of Lopez's weapons does not mention any security risk as grounds for the seizure.  Instead it merely cites a "failure to notify change of address" as the reason for the seizure.  (See Docket No. 107-2.)

[3] The provision provides the necessary grounds for a law enforcement officer to seize the weapons of a licensed owner.

Any law enforcement officer shall seize the license, weapon and ammunition owned by a licensee when he/she has grounds to believe that the licensee has made or shall make illegal use of said weapon and ammunition to harm other persons; has threatened to commit a crime; has stated the intent to commit suicide; has repeatedly demonstrated negligence or carelessness in handling the weapon; when it is deemed that the holder has a mental condition, is considered to be a habitual drunkard, or is addicted to controlled substances; or in any other situation of serious risk or danger

**Civil No. 08-1212(GAG)**                    7

Director of the Weapons Registry, Carmen B. Carasquillo.  The order was then directed to the Superintendency of Illegal Weapons and Narcotics headed by Jose Dennis Tavales ("Tavales"). Tavales then asked Sergeant Andino, director of the Division of Army Inspection and Investigations, to carry out the order to seize.  At that point, Agents Triado and Gallardo, accompanied by Sgt. Andino, carried out the seizure as described above.  Once all three of Lopez's weapons were seized, Agent Gallardo went to the General Headquarters and placed the weapons in a vault.  According to Gallardo, he was the only person with access to the weapons on that night.  He did not allow anyone to take pictures of the weapons that were seized and did not remove them from the vault.

On February 16, 2007, two articles appeared in "El Vocero" under the titles "En Lio Con Armas"("In Trouble With Weapons") and "En Problemas Con Lay Ley" ("In Trouble With The Law").  The article described the police operative from the night before, in which the PRPD went to Lopez's home and seized his weapons.  The article also contained a picture of the weapons which were seized.

Andino stated in his deposition that he considered this change of address to be an administrative matter and found it odd that the press was there to cover an administrative matter and wholly irregular for the press to have taken pictures of the seized weapons.  Marrero agreed with Andino's assertion, claiming that he felt that in conducting the intervention "the police went overboard" and that the entire event could have been handled in a civil manner and not made a "spectacle."  He further stated that he was "not in agreement with the operative" nor with "everything that came out in the press."

Approximately one week after the seizure of the weapons, co-defendant Pedro Toledo Davila ("Toledo"), Superintendent of the PRPD, was interviewed by the radio station "NotiUno" regarding

_____

that justifies this emergency measure.

P.R. Laws Ann. tit. 25, § 456l.

**Civil No. 08-1212(GAG)**                                      8

the police operation to seize Lopez's weapons.  During his interview he stated that he believed the right amount of prudence was not exercised in carrying out the operation so quickly.  He also insinuated that the PRPD had acted improperly in stating that "there are certain cases like this one that are being inves . . . [*sic*] through the normal channels to avoid the appearance that it was done in retaliation."  However, during Toledo's deposition, he stated he did not recall being interviewed by "NotiUno" and denied making these comments to the radio station.  When asked about the event, he answered that he had no knowledge of the operation or how it was carried out on that night.  He further stated that the police intervention was not an unusual way of carrying out a change of address violation and that they "do that regularly."

On June 30, 2007, Harry Vega, the Inspector of Cooperatives, told Lopez that his position at the Inspector's office would not be renewed because there were no funds allocated for the position.  According to Roberto Santiago-Cancel ("Santiago"), Deputy Inspector for the Office of the Puerto Rico Credit Union Cooperative Inspector, Velasco did not intervene to amend the proposal to provide sufficient funds in order to keep Lopez in this position.  Lopez ceased to work for the Inspector's Office on June 30, 2007.  Lopez contends that Velasco's failure to intervene and amend the proposal of funds was done as retaliation for bringing the allegations of sexual harassment against his former employer.

On February 15, 2008, plaintiffs in the above-captioned case filed this action for declaratory relief and money damages against the named defendants.  Lopez alleged that since December of 2005 defendant Velasco began a pattern of sexual harassment that continued until his resignation. He further alleges that as a direct result of the public announcement of his sexual harassment claim, agents of the PRPD, went to his home, at the supposed behest of Velasco, in order to have him arrested for not notifying a change of address in the Arms Registry Division of the PRPD.  He further contends that the named defendants in the PRPD conspired and retaliated against him in carrying out this police operative.  He alleges that the police operative, which was conveniently covered by the press, portrayed him in a bad light and defamed his good character in the community.

**Civil No. 08-1212(GAG)**                    9

Lopez also alleges that Velasco's failure to intervene in approving the funds necessary to retain Lopez's position at the IOC constitutes an act of retaliation by Velasco against Lopez for his actions in seeking redress for the alleged acts of sexual harassment.  Lopez, as well as the members of Lopez's family, claim that as a result of the alleged acts of sexual harassment and the events that occurred between February 14 and 16, 2007, they have suffered irreparable injury in the form of extreme mental trauma, depression, humiliation, and emotional distress as well as monetary damages from the damages to their reputation.

**III.     Discussion**

       *A.     Sexual Harassment Claims*

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  "Harassment on the basis of sex is a violation of . . . [T]itle VII.  Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment . . . ." 29 C.F.R. § 1604.11 (2010).  A plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment.  See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986).  "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." Harris v. Forklift Systems, Inc. 510 U.S. 17, 21 (1993) (quoting Meritor, 477 U.S. at 65, 67).  "In essence, by creating a hostile environment, they force a man or woman to run a gauntlet of sexual abuse in return for the privilege of being allowed to work and make a living." Lipsett v. University of Puerto Rico, 864 F.2d 881, 897 (1st Cir. 1988) (internal quotations omitted).

      There are number of factors that must be demonstrated for a plaintiff to succeed in a hostile work environment claim: (1) the plaintiff is a member of a protected class; (2) the plaintiff was subjected to unwelcome sexual harassment; (3) the harassment was based upon sex; (4) the

**Civil No. 08-1212(GAG)**                    10

harassment was sufficiently severe or pervasive so as to alter the conditions of the plaintiff's employment and create an abusive work environment; (5) the sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.  See O'Rourke, 235 F.3d at 728 (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787-89 (1998)).

Puerto Rico Law 17 prohibits sexually harassing behavior in employment.  It defines it as a form of sexual discrimination that constitutes an illegal and undesirable practice.  See P.R. Laws Ann. tit. 29, § 155.  When assessing claims under Law 17, the same exacting standard that is applied to Title VII claims is employed in Puerto Rico courts in establishing the existence of a hostile work environment.  See Sanchez et al. v. A. E. E., 1997 WL 878520; Rodriguez Melendez v. Supermercado Amigo, Inc., 1990 WL 657444.

### 1.    Liability of Ramon Velasco

As described above, Lopez alleges a number of instances in which he felt sexually harassed by his former employer, Ramon Velasco.  He further alleges that the combined effect of these acts of harassment made him feel constantly ashamed and embarrassed, eventually compelling him to resign from his position.  The question that this court must consider is whether or not the combined effect of these alleged acts was sufficiently severe or pervasive as to alter the conditions of Lopez's employment and create an abusive working environment. See Harris, 510 U.S. at 21.

"The existence of a hostile environment is determined by the finder of fact, though . . . that does not prevent a court from ruling that a particular set of facts cannot establish a hostile environment as a matter of law in an appropriate case." Billings v. Town of Grafton, 515 F.3d 39, 47 (1st Cir. 2008) (internal citations omitted); see also Gorski v. N.H. Dep't of Corrections, 290 F.3d 466, 474 (1st Cir. 2002) (finding that "[s]ubject to some policing at the outer bounds," the question as to whether employer's actions created a hostile work environment is usually decided by the trier of fact).  When ruling on a motion for summary judgment, whether or not a plaintiff's allegations sufficiently allege a hostile work environment claim is not dependent on a finding of any particular

**Civil No. 08-1212(GAG)**                    11

type of conduct.   See Billings, 515 F.3d at 48.   Instead, the court must consider a number of circumstances in making this determination.  Id.  "These circumstances 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance,' but are by no means limited to them, and 'no single factor is required.'" Id. (quoting Harris, 510 U.S. at 23).

When considering all of Lopez's allegations as true, the court finds that a reasonable jury could find that the totality of Velasco's alleged actions, which, according to Lopez's testimony, took place on a daily basis over a period of two years, could have created an abusive working environment when viewed either objectively or subjectively.  See O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001) ("Evidence of sexual remarks, innuendoes, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment."); see also Marrero v. Goya of Puerto Rico, Inc., 304 F.3d 7, 19-20 (1st Cir. 2002) (finding persistent sexual remarks and innuendoes as well as unwanted sexual invitations sufficient for hostile work environment claim).  Based upon the facts as presented to the court, the jury could reasonably find that Lopez was subjected to harassment on a daily basis, in the form of humiliating sexual remarks and innuendos (i.e. comments about his buttocks, whether he shaved his genitals, and insinuations that Lopez was a homosexual that had sexual relations with fellow employees) as well as through Velasco's alleged attempt to have unwanted sexual relations with Lopez.

Further, in support of his allegations, Lopez also offered the testimony of former Special Assistant for Labor Affairs, Lysander Rivera-Velasquez ("Rivera").  The testimony described similar acts of harassment by Velasco against Rivera during his time with the LDPR.  These similar allegations, which occurred within the same workplace, further support the sufficiency of Lopez's hostile environment allegation.  See Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 55-56 (1st Cir. 2000) ("Evidence of the harassment of third parties can help to prove a legally cognizable claim of a hostile environment.").

This court has already dismissed the Title VII claim with regard to the individual liability of

**Civil No. 08-1212(GAG)**                    12

Roman Velasco (See Docket No. 78), as Title VII does not hold individuals liable for sexual harassment in the workplace.  See Fantini, 557 F.3d at 31.  However, Puerto Rico's law against discrimination in the workplace, Law 17, does provide for the imposition of individual liability upon any person responsible for the illegal conduct.  See Pacheco Bonilla v. Tooling & Stamping, Inc. , 281 F. Supp. 2d 336, 339 (D. P. R. 2003) (citing Rosario-Toledo v. Distribuidora Kikuet, Inc., 153 D. P. R. 125 (2001)).  As Velasco's acts were sufficient to satisfy the exacting standards of a Title VII hostile environment claim, Lopez has provided sufficient evidence to create a triable issue with regard to Velasco's individual liability under Puerto Rico state law.  See Valentin-Almeyda v. Municipality of Aguadilla, 447 F.3d 85, 101 (1st Cir. 2006) (recognizing that "Puerto Rico interprets Law 17 as congruent with Title VII.").

Therefore, as a reasonable jury could conclude that Lopez suffered sexual harassment in the form of a hostile work environment, the court **DENIES** summary judgment with regard to the Puerto Rico state law sexual harassment claims against defendant Ramon Velasco.

### 2.     Liability of the Labor Department of Puerto Rico

"An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate . . . authority over the employee." Burlington Industries, Inc., v. Ellerth, 524 U.S. 742, 745 (1998).  However, if the claim of sexual harassment is not in the form of a tangible employment action, the defending employer may raise an affirmative defense to liability.  Id.  To satisfy this defense, the employer must show "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise."  Id.  "As to the first element of the defense, proof of an anti-harassment policy with a complaint procedure available to employees, while not necessarily dispositive, is relevant."  See Arrieta-Colon v. Wal-Mart P.R., Inc., 434 F.3d 75, 86 (1st Cir. 2006).  With regard to the second prong of the defense, the First Circuit has held that while "[t]here is no bright-line rule as to when a failure to file a complaint becomes unreasonable . . . more than ordinary fear or embarrassment is needed."  See Reed v.

Civil No. 08-1212(GAG)                    13

MBNA Marketing Systems, Inc., 333 F.3d 27, 35 (1st Cir. 2003). Therefore, in assessing the reasonableness of an employee's silence, the courts have looked to whether the employee has provided  a reason for his belief that the complaint would be futile or would result in affirmative harm.  Id. "Though the burden of proof lies on the employer as to both prongs of the affirmative defense, summary judgment for the employer is still possible so long as raw facts are undisputed or assumed in favor of the plaintiff."  Id. at 34.

Lopez admitted that he was aware of the LDPR policy against sexual harassment when he was hired. (See Docket No. 112 at 8 # 48.)  He also admitted that the written policy was provided to him and he had access to claiming procedures.  (See Id.)  He further admits that he filed no complaint during his employment with the LDPR.  (See Docket No. 112 at 8 # 49.)  Therefore, based on these facts, the LDPR has met the first requirement of the defense.  Under the second prong, the court must decide whether or not Lopez's failure to report Velasco's actions was reasonable.  In analyzing the plaintiff's evidence, Lopez's statement of facts does not provide evidence which raises his failure to report above the level of unreasonableness, as defined by the Supreme Court and interpreted by the First Circuit.  See Reed, 333 F.3d at 35-36 (citing generally Faragher, 524 U.S. 775; Ellerth, 524 U.S. 742).  In his statement of facts Lopez recites that he did not tell Velasco the way he felt because "he feared reprisals" and that "he didn't want to say anything about the sexual harassment because it was embarrassing to him."  (See Docket No. 112 at 12 # 8; 14 #27.)  In making these assertions, Lopez merely recites the exact language that the First Circuit has adjudged to be insufficient to impose vicarious liability upon an employer.  See Reed, 333 F.3d at 35 (requiring more than "ordinary fear or embarrassment" because reporting sexual harassment by a supervisor will always be difficult).  Even when taking all of Lopez's allegations as true, his failure to report Velasco's acts to the LDPR would not be considered reasonable as a matter of law.[4]  Thus,

_____

[4] Plaintiffs' opposition does not at all raise the issue of futility with regard to Lopez's failure to utilize the internal procedures at the LDPR for dealing with claims of sexual harassment. Therefore, even though Velasco's position of power as the Secretary of Labor may have made Lopez's efforts to report the harassing actions futile, such considerations were not considered by the

**Civil No. 08-1212(GAG)**                    14

the LDPR's affirmative defense succeeds in defeating Lopez's claim.

Therefore the court **GRANTS** defendant LDPR's motion for summary judgment with regard to Lopez's Title VII and Law 17 hostile work environment claims, and **DISMISSES** this claim with prejudice.[5]

### 3.    Title VII Retaliation Claim

Lopez claims that Roman Velasco illegally retaliated against him following the filing of his sexual harassment complaint against the Secretary of Labor. In making this assertion, Lopez asserts that his employment at the IOC ended because Velasco purposely withheld funds that were necessary to retain his position.

Plaintiff pleads his retaliation claim under 42 U.S.C. § 2000e-3(a) which "forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 60 (2006) (citing 42 § 2000e-3(a)). Therefore, to prove a *prima facie* case of retaliation Plaintiff must allege that: (1) he engaged in protected conduct under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity. Fantini v. Salem State College, 557 F.3d 22, 32 (1st Cir. 2009). As to the first prong, "[a]n

_____

court as they were not raised by the plaintiff.

[5] Section 10 of Law 17 establishes an employer's obligations with regard to dealing with sexual harassment in the workplace. See Arroyo Rodriguez v. Econo Supermarket, Inc., 204 F. Supp. 2d 289, 293 n.2 (D.P.R 2002). "To be in compliance with the law the employer must: 1) express a strong policy against sexual harassment; 2) make the prohibition of sexual harassment known; 3) give publicity to job applicants regarding their right to be free from harassment; and 4) establish an effective internal procedure for handling complaints." Id. (citing P.R. Laws Ann. tit. 29, § 155i). These obligations are similar to the requirements that an employer must demonstrate to meet the Ellerth-Faragher affirmative defense. Therefore, although it is not expressly mandated, the court applied the Ellerth- Faragher analysis in granting summary judgment for the Law 17 claim against defendant LDPR. See Landrau Romero v. Caribbean Restaurants, Inc., 14 F. Supp. 2d 185, 193 (D.P.R. 1998) (recognizing the obligations of an employer regarding sexual harassment in the workplace).

**Civil No. 08-1212(GAG)**                    15

employee has engaged in activity 'protected by Title VII if he has either (1) opposed any practice made an unlawful employment practice by Title VII or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII.'" Id. (quoting Long v. Eastfield College, 88 F.3d 300, 304 (5th Cir.1996)).

On February 9, 2007, Lopez filed a claim with the LDPR and the EEOC alleging that he was sexually harassed during his employment. Approximately five months later, on June 30, 2007, Lopez was informed that his position at the IOC was being terminated.  According to Deputy Inspector Santiago, Velasco intervened to oppose the approval of the funds necessary to retain Lopez's position.  Santiago stated in his deposition that Velasco did not accept his proposal to retain Lopez even though Velasco had originally called to amend the funds in order to hire Lopez.

The facts, as presented by the plaintiff, establish a *prima facie* case of retaliation.  While there is minimal evidence demonstrating a causal connection between the protected activity and the negative employment action, there is enough evidence from which a reasonable jury could surmise that Velasco's decision to oppose the expenditure of funds was premised upon Lopez's complaint against him.  See Che v. Massachusetts Bay Transp. Authority, 342 F.3d 31, (1st Cir. 2003) (quoting Kosereis v. Rhode Island, 331 F.3d 207, 213 (1st Cir.2003)) (establishing a *prima facie* case in a retaliation action requires only "a small showing that is not onerous and is easily made").  The deposition testimony of Santiago, in which he describes Velasco's efforts not to approve the funds, demonstrates, at the very least, that it was Velasco who was responsible for the decision not to retain Lopez's position after previously approving the funds to employ him.  This evidence, coupled with the proximity in time to Lopez's filing of his complaint (five months), presents enough for the jury to infer that Velasco's actions not to approve the funds were precipitated by retaliatory motives. Cf. King v. Town of Hanover, 116 F.3d 965, 968 (1st Cir. 1997) (five month lapse between complaint and disciplinary action found to be too long to establish retaliation claim where plaintiff failed to point to any other evidence demonstrating that action was retaliatory).

As the plaintiff has established a *prima facie* case of retaliation, the burden then shifts to the defendant to prove a legitimate non-retaliatory reason for the negative employment action.  See

**Civil No. 08-1212(GAG)**               16

McDonough v. City of Quincy, 452 F.3d 8, 17 (1st Cir. 2006) (citing generally McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)) (applying Mcdonnell-Douglas burden shifting analysis to retaliation claims).  In his motion for summary judgment, defendant Velasco has failed to offer a legitimate non-retaliatory reason for the failure to approve the funds necessary to retain Lopez's position.  As a reasonable jury could find that Velasco was motivated by retaliation when he chose not to approve the necessary funds to retain Lopez's position, the court is unable to rule upon plaintiff's retaliation claim as a matter of law at the summary judgment stage.

Therefore the court **DENIES** defendant LDPR's motion for summary judgment with regard to Lopez's Title VII retaliation claim.

### 4.    Law 100 Claim

Law 100 prohibits an employer from discharging an employee for discriminatory animus based on sex.  See P.R. Laws Ann. tit. 29, § 146.  However, "Law 100 does not apply to government employers; it protects only employees in the private sector and employees of government entities that operate as private businesses.  See Mercado-Echevarria v. Puerto Rico Dept. of Corrections, 2009 WL 2461718 at *3 (citing P.R. Laws Ann. tit. 29, § 151(3)).

Therefore the court **GRANTS** defendants' motions for summary judgment with regard to Lopez's Law 100 claim.  This claim is hereby **DISMISSED** with prejudice.

### 5.    Negligence Claims for the Harassing Behavior

The plaintiffs further claim, that due to the aforementioned discrimination, they have suffered pain, mental anguish, depression, and emotional distress.  However, in bringing this claim, the plaintiffs are unable to demonstrate the breach of any duty owed to them by the LDPR.  Showing negligence on behalf of the employer, "[t]ypically, [] involves a showing that the employer knew or should have known about the harassment, yet failed to take prompt action to stop it." Rosario-Mendez v. Hewlett Packard Caribe BV, 638 F. Supp. 2d 205, 225 (D.P.R. 2009) (quoting Noviello v. City of Boston, 398 F.3d 76, 95 (1st Cir.2005)).  Plaintiff's have failed to offer any

**Civil No. 08-1212(GAG)** 17

evidence that the LDPR was aware of the alleged acts of sexual harassment.[6]  Furthermore, the LDPR had a system in place for dealing with claims of sexual harassment, which Lopez failed to utilize.  See Ortiz v. Hyatt Regency Cerromar Beach Hotel, Inc., 422 F. Supp. 2d 336, 344-45 (granting summary judgment on negligence standard when employer had sexual harassment policy in place)

Additionally, Lopez's negligence claims against Velasco is preempted by his Law 17 claim.  "[T]o the extent that a specific labor law covers the conduct for which a plaintiff seeks damages, he is barred from using that same conduct to also bring a claim under Article 1802." Rosario v. Valdes, 2008 WL 509204 at *2 (D.P.R. 2008).  However, with regard to the Co-Plaintiffs' negligence claims against Velasco for his alleged harassing actions, the Puerto Rico Supreme Court has held that Article 1802 of the Civil Code can provide relatives or loved ones monetary relief for the harassment sustained by an employee.  See Santini Rivera v. Serv. Air, Inc., 1994 WL 909527.

Therefore, the court **GRANTS** defendants' motion for summary judgment with regard to Lopez's negligence claims and **DISMISSES** them with prejudice.  The court **DENIES** Velasco's motion for summary judgment with regard to the Co-Plaintiffs negligence claims, brought pursuant to Article 1802 of the Civil Code.

### B.    The Seizure of the Weapons

#### 1.    The § 1983 Claims

Lopez, as well as various other co-plaintiffs, all members of Lopez's family, sued co-defendants Velasco, Vasquez, and Toledo under § 1983, claiming that the actions taken by the PRPD officers on the night of February 15, 2007, during the police operative to seize Lopez's weapons, violated their constitutional rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.

To establish liability under § 1983 plaintiffs must demonstrate that defendants, acting under color of state law, violated plaintiffs' federal constitutional rights, thereby causing the complained

**Civil No. 08-1212(GAG)**                    18

of injury.  See West v. Atkins, 487 U.S. 42, 48 (1988).  In order to show this, the plaintiff is required

to show two things: "(1) there must have been an actual deprivation of the plaintiff's federally

protected rights; and (2) there must have been a causal connection between the defendant's conduct

and the deprivation of the plaintiff's federal rights."  Figueroa-Garay v. Municipality of Rio Grande,

364 F. Supp. 2d 117, 122 (D. P. R. 2005).  This second element of causal connection requires that

the plaintiff show (1) it was the defendant's own actions that deprived the plaintiff of the protected

right; and (2) that the conduct was intentional, grossly negligent, or amounted to a reckless or callous

indifference.  Id. (internal citations omitted).

         In their motion to dismiss, the defendants aver that the various members of Lopez's family

(collectively "the Co-Plaintiffs"), do not have standing to sue based on the alleged violations of

Lopez's federally protected rights.   § 1983 imposes liability for conduct that subjects the

*complainant* to the deprivation of the Constitution and law of the United States.  See Rizzo v.

Goode, 423 U.S. 362, 370-71 (1976).  The Co-Plaintiffs are unable to bring actions under § 1983

as they have failed to demonstrate any act on the part of the appearing defendants that was directed

at them or that incidentally affected their family relation.  See Torres v. U.S., 24 F. Supp. 2d 181,

184 (D.P.R. 1998) (citing Brown v. Ives, 129 F.3d 209, 211 (1st Cir. 1997)).  Instead, the Co-

Plaintiffs claim that they suffered harm as a result of the defendants' actions which were allegedly

directed at Lopez.  Such allegations are insufficient to bring a valid claim under § 1983.  See Quiles

Ex Rel. Project Head Start, Municipality of Utuado v. Hernandez Colon, 682 F.Supp 127, 129.

(D.P.R. 1988) (recognizing that "[o]ne person may not sue, nor recover damages, for the deprivation

of another person's civil rights.").

         Therefore, the § 1983 claims raised by Brenda Bezares Martinez, Daniel Rodriguez Diaz,

Maria de los Angeles Muniz Pello, Fernando Rodriguez Diaz, Julia Diaz Rodriguez, Sussane

Rodriguez Lopez, and Zoraida Rodriguez Diaz (collectively "the Co-Plaintiffs) are **DISMISSED**

with prejudice.  The court will analyze Lopez's remaining § 1983 claims against defendants Velasco,

Toledo, and Vasquez.

         The first step in the analysis under § 1983 is to establish the constitutional right allegedly

**Civil No. 08-1212(GAG)**                    19

infringed.  Albright v. Oliver, 510 U.S. 266, 271 (1994).  Lopez alleges violations of his rights under the Fourteenth and Fourth Amendments of the U.S. Constitution.  "The Supreme Court has held that 'because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically-intrusive governmental conduct, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" Colon-Andino v. Toledo-Davila, 634 F. Supp. 2d 220, 236 (D.P.R. 2009) (quoting Graham v. Connor, 490 U.S. 386, 395 (1989)).  Therefore, the court will proceed to analyze Lopez's allegations under a Fourth Amendment standard.  See Id. at 234 (analyzing § 1983 claim under Fourth Amendment when officers allegedly entered property improperly and seized plaintiffs weapons).

The Fourth Amendment is implicated only if defendants' conduct infringed upon "an expectation of privacy that society is prepared to consider reasonable." O'Connor v. Ortega, 480 U.S. 709, 715 (1987).  In their motions for summary judgment, the defendants claim that there has been no violation of the plaintiffs' constitutional rights as the seizure of the guns was permitted by law and the requisite process to conduct said seizure was followed.  In response, Lopez has provided statements and deposition testimony from Officers Toledo, Merrero, and Andino which contradicts the defendants' assertions that all of the proper procedures were followed when carrying out the police operative on February 15, 2007.  This evidence supports Lopez's contention that perhaps the PRPD was not following routine procedure when they showed up at his home to seize his weapons based on an uncorroborated tip from the media.  Supported by this evidence, Lopez has successfully demonstrated a material issue of fact with regard to whether or not the proper procedures were followed in establishing the necessary grounds to seize the weapons and whether the seizure itself was executed properly.

Thus, based upon the evidence provided by Lopez, a reasonable jury could find that the alleged actions, taken by the PRPD on February 15, 2007, resulted in a violation of Lopez's Fourth Amendment Constitutional rights.

The second step in the analysis is to decide whether or not each named defendant was personally and directly involved in causing the alleged violation of the plaintiff's federally protected

**Civil No. 08-1212(GAG)**                    20

rights.  See Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 562 (1st Cir. 1989).  The court will assess each defendant separately to decide if Lopez has presented evidence creating a material issue of fact with respect to this second element.

### a.    *Claim Against Velasco*

With regard to Lopez's claims against former Secretary of Labor Roman Velasco, Lopez has not provided any evidence connecting Velasco to the police operation which he alleges caused his deprivation of rights.  All of the testimony provided by various members of the PRPD denies any communication with any employee of the Secretary of Labor.  Furthermore, Lopez himself states that any claim alleging that Velasco was responsible for the actions of the PRPD is merely speculative. (See Docket No. 95-11 at 26.)  While it is highly suspicious that the police operative was conducted only thirteen (13) hours after Lopez went public with his allegations against Velasco, such speculation is not enough to defeat a motion for summary judgment.  See Sullivan v. City of Springfield, 561 F.3d 7, 16 (1st Cir. 2009) (recognizing that "plaintiffs' speculation that there may be a causal chain, without supporting evidence, is insufficient to survive summary judgment."); see also Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 53 (1st Cir.1997) (upholding grant of summary judgment in § 1983 suit in which plaintiffs "offered no competent evidence that could have supported a finding" of causation); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 583 (1st Cir. 1994) (upholding summary judgment because "tenuous assertions strung together by strands of speculation" were insufficient to establish a "causal link between [defendant]'s activities and the alleged deprivation of constitutional rights").

Therefore, with regard to Lopez's § 1983 claim against defendant Velasco, the court **GRANTS** Velasco's motion for summary judgment and **DISMISSES** this claim with prejudice.

### b.    *Claim Against Toledo*

Lopez also brings a § 1983 claim against the Superintendent of the PRPD, Pedro Toledo Davilla.  To support his claim, Lopez offers the deposition testimony of Toledo as well as a transcript from an interview of Toledo which was conducted by "NotiUno" days after the police intervention.  In the interview, Toledo states that he believed the police didn't act with the right

**Civil No. 08-1212(GAG)**                    21

amount of prudence in conducting the seizure and also intimated that such a hastily carried-out operation gave the appearance of retaliation. However, in his deposition, Toledo testified that he does not remember giving an interview to "NotiUno" and further stated that the police acted properly in conducting the seizure. The inconsistencies between the deposition and the interview clearly highlight that Toledo is not being entirely truthful regarding his personal assessment of the actions of the officers on that day. However, even if Toledo did in fact make these alleged statements during his interview, such evidence is not sufficient to hold Toledo liable under § 1983. "Because the doctrine of *respondeat superior* is inapplicable in actions brought under § 1983, supervisors will be held accountable under the law solely 'on the basis of [their] own acts or omissions.'" Rodriguez v. Andreu Garcia, 2007 WL 1975005, at *3 (D.P.R. 2007) (quoting Diaz v. Martinez, 112 F.3d 1, 4 (1st Cir. 1997)). Absent direct participation, a supervisor may only be held liable where "(1) the behavior of his subordinates results in a constitutional violation, and (2) the supervisor's action or inaction was affirmatively linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." Pineda v. Toomey, 533 F.3d 50 (1st. Cir. 2008) (internal quotations omitted).

Lopez provides no evidence that Toledo had any part in the planning of the operation, nor can the plaintiffs demonstrate that Toledo was directly responsible for giving an order to carry out the operation in the manner in which it was conducted. Furthermore, the plaintiffs cannot point to any omission by Toledo that resulted in the police action, as they have not demonstrated that any action by Toledo would have prevented its occurrence. Toledo's testimony merely reinforces the fact that he had nothing to do with the decision to seize the weapons in the manner which it was conducted, as such orders are regularly handed down by an entirely separate department.

As Lopez is unable to create an issue of material fact with regard to the required causal link between the named defendant's actions and the alleged constitutional deprivation, the court **GRANTS** defendant Toledo's motion for summary judgment and **DISMISSES** the § 1983 claim against him with prejudice.

**Civil No. 08-1212(GAG)**                    22

### c.    *Claim Against Vasquez*

Finally, Lopez brings a § 1983 claim against Luis Rodriguez Vasquez, acting Director of the Weapons Registry Office.  On February 15, 2007, it was Vasquez that gave the order to seize Lopez's weapons.  Vasquez claims that the orders to investigate and seize Lopez's weapons came from Marrero's determination that Lopez's allegations against Velasco presented a security risk to a public official.  Based upon this information, Vasquez made the order to go to Lopez's home and seize the weapons.

Lopez has provided a number of depositions and other pertinent evidence demonstrating, at the very least, a material issue of fact with regard to whether or not Vasquez's order to seize the weapons, in the manner in which it was conducted, was proper.  In support of his claim, Lopez offers: (1) the conflicting statements of Toledo; (2) the testimonies of Marrero, and Andino; (3) the fact that the seizure occurred only 13 hours after the announcement of Lopez's allegations; (4) the manner in which the investigation was conducted (i.e. not verifying the information provided by Mangual, the conflicting rationale as to why the failure to notify an address change was not handled administratively, the number of agents conducting the seizure, and presence of the media during the seizure).  The court finds that the aggregate of this evidence provides enough support for a reasonable jury to infer that Vasquez's actions, in ordering the seizure of the weapons in the manner with which it was done, may have been improperly motivated, and in turn may have directly resulted in a violation of Lopez's constitutional rights.

Therefore, the court **DENIES** defendant Vasquez's motion for summary judgment with regard to Lopez's § 1983 claim against him.  Furthermore, the issue of qualified immunity cannot be decided as a matter of law, with respect to Vasquez, as there exist issues of material fact as to whether or not there was sufficient grounds to consider Vasquez's order to seize reasonable under the circumstances.

### 2.    Negligence Claims for the Seizure of the Weapons

Plaintiffs also bring negligence claims under Puerto Rico state law against defendants Velasco, Toledo, and Vasquez for the alleged injuries caused by the events which occurred on

**Civil No. 08-1212(GAG)**                          23

February 15, 2007 surrounding the seizure of Lopez's weapons.  With regard to the Co-Plaintiffs'

derivative claims, the Puerto Rico Supreme Court has repeatedly recognized, individuals who suffer

distress because a relative or loved one is tortiously injured have a cause of action under Article

1802.  See Santini, 1994 WL 909527.  The Co-Plaintiffs' causes of action are derivative and are

dependant upon the viability of Lopez's negligence claim.  See Caban Hernandez v. Philip Morris

USA, Inc., 486 F.3d 1, 12-13 (1st Cir. 2007).  "In order to establish a cause of action under Article

1802, a plaintiff has to satisfy the following three elements: (1) an act or omission constituting fault

or negligence; (2) a clear and palpable damage; and (3) a legally sufficient causal relationship

between defendant's tortuous conduct and the injuries sustained by plaintiff."  Munoz Rivera v.

Walgreens Co., 428 F. Supp. 2d 11, 33 (D.P.R. 2006).

      The negligence claims against Velasco suffer the same deficiencies as the § 1983 claims

against him.  Plaintiffs are unable to offer any evidence identifying a causal relationship between the

named defendant's actions and the alleged injuries they have suffered.  See Burgos-Yantin v.

Municipality of Juana Diaz, 2009 WL 4730780 at *1 (D.P.R. 2009) (recognizing that, "[w]hile the

standard for negligence under the state law claim may not be as exacting as the deliberate

indifference standard required under a § 1983 claim, such a claim still demands a showing of

causation.").  Therefore, the court **GRANTS** defendants' motions for summary judgment and

**DISMISSES** with prejudice the state law negligence claims against Velasco.

      With regard to the plaintiffs' negligence claims against Vasquez and Toledo, plaintiffs have

identified a causal relationship between Vasquez's actions and the resulting injuries, as it was his

order, as the acting Director the Weapons Registry Division, which prompted the police intervention.

Furthermore, under 1803 of the Civil Code of Puerto Rico, vicarious liability is apportionable to

"directors of an establishment or enterprise . . . for damages caused by their employees in the course

of their employment or on account of their duties."  Burgos-Oquendo v. Caribbean Gulf Refinging

Corp., 741 F.Supp. 330, 333 (D.P.R. 1990).  Therefore, Toledo, as Superintendent of the PRPD, can

be held vicariously liable for the actions of his inferior employees (Vasquez).  As Plaintiffs have

presented an issue of material fact as to whether or not Vasquez's actions, which resulted in the

**Civil No. 08-1212(GAG)**                    24

alleged emotional and reputational injuries, were negligent, the court **DENIES** defendants' motion for summary judgment with respect to the plaintiffs' negligence claims against both Vasquez and Toledo.

**IV.      Conclusion**

For the foregoing reasons, the court **GRANTS** in part and **DENIES** in part Defendants' motions for summary judgment.  The only claims remaining before this court are Lopez's Title VII retaliation claim, Lopez's Law 17 claim against Ramon Velasco, the Co-Plaintiffs derivative state law negligence claims against Velasco, Lopez's § 1983 claim against Vasquez, and the Co-Plaintiffs' Puerto Rico state law negligence claims against Vasquez and Toledo.  The remaining claims are **DISMISSED** with prejudice.

**SO ORDERED**

In San Juan, Puerto Rico this 16th day of February, 2010.

*S/Gustavo A. Gelpí*

GUSTAVO A. GELPÍ

United States District Judge